**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____x

In re:

Foreign Economic Industrial Bank Limited,
"Vneshprombank" Ltd.,

    Debtor in a Foreign Proceeding.

_____x

In re:

Larisa Markus,

    Debtor in a Foreign Proceeding.

_____x

Yuri Rozhkov and The State Corporation
"Deposit Insurance Agency",

    Plaintiffs,

        v.

LARMAR Foundation; Ilya Bykov; BG Atlantic,
Inc.; LM Realty 31B, LLC; LM Realty 31C, LLC;
LM Realty 27D, LLC; LM Realty 24C, LLC; LM
Realty 23H, LLC; LM Realty 20A, LLC; LM
Realty 18 West, LLC; LM Realty 10C, LLC; LM
Property Management LLC; Innovative
Construction Group, Inc.; First Integrated
Construction, Inc.; and Larisa Markus,

    Defendants.

_____x

Chapter 15
Case No. 16-13534 (MG)

Chapter 15
Case No. 19-10096 (MG)

**Adversary No. 19-**

## ADVERSARY PROCEEDING COMPLAINT

    Plaintiff, Yuri Rozhkov, in his capacity as the authorized Trustee and Foreign Representative ("***Markus* FR**") of Larisa Markus ("**Markus**"), and Plaintiff, The State Corporation "Deposit Insurance Agency" ("**DIA**"), in its capacity as the authorized Trustee and Foreign Representative ("***Bank* FR**") of Foreign Economic Industrial Bank Limited "Vneshprombank" Ltd. ("**Bank**") (together, "**Plaintiffs**" or "**FRs**"), bring this action for the benefit of Markus' and the Bank's estates and their creditors, and complain against Defendants, as follows:

## I.   INTRODUCTION

    **1.**    Larisa Markus ("**Markus**") engaged in a massive $2 billion fraud to embezzle monies from the Bank and then hide the funds in foreign countries.  This included the Larisa

Markus Revocable Trust ("**LM Trust**"), a New York trust, LARMAR Foundation ("**LARMAR**"), a Panama trust with its principal place of business in New York, and real property located in England, France, and Latvia – all managed by her trusted accountant and financial administrator, Ilya Bykov ("**Bykov**"), in New York. In 2015, the Bank failed and Markus was arrested. Markus pled guilty to embezzling over $2 billion from not later than 2009 through 2015 and is now in a Russian jail. But the fraud did not stop there.

2.      The trustee appointed for the Bank obtained Chapter 15 recognition of the Bank's Russian insolvency proceeding in February 2017. Markus was placed in bankruptcy in Russia in 2016. The trustee appointed for Markus obtained Chapter 15 recognition of her bankruptcy in February 2019. Despite repeated efforts by Bykov and Markus to stonewall discovery (through Bykov and through Markus' attorney, Victor Worms), the *Bank* FR and *Markus* FR learned that companies owning over $15 million in real property in New York, as well as other assets, were fraudulently transferred to the LM Trust and LARMAR between 2008 and dates unknown. But the fraud did not stop there.

3.      Despite the Bank serving discovery requests seeking disclosure of all Markus' assets in 2017, Bykov concealed documents evidencing Markus owned over $25 million in properties in England, France, and Latvia. Thus, it was only in May 2019 that the *Bank* and *Markus* FRs uncovered that BG Atlantic, Inc. ("**BG Atlantic**"), a New York company, secretly controlled by Bykov, had obtained a collusive $4.7 million New York judgment and then enforced it in England against Markus' properties. Over $5 million was wired to BG Atlantic; its location remains unknown. Another $5 million was wired to the LM Trust, of which $4.1 million was frozen by this Court on May 29, 2019. The remaining $1 million was dissipated by Bykov. But the fraud did not stop there.

4.      During the course of the *Bank* and *Markus* Chapter 15 proceedings, in addition to Bykov and Markus (through her attorney, Mr. Worms) stonewalling discovery and

concealing assets, Bykov secretly arranged for the LM Trust to borrow over $800,000 on

Markus' life-insurance policies and then dissipated those funds.  And the fraud continues.

5.     In 2019, Bykov engaged in ham-handed attempts to obstruct the *Markus* FR's

administration of Markus' assets, including backdating ownership documents to transfer

Markus' 100% interest in 550 Park Avenue, LLC (which had over $3.1 million in its bank

account) to LARMAR, and filing "amended" tax returns to create a false story of transfer of

Markus' 100% interests in First Integrated Construction, Inc. and Innovative Construction, Inc.

to LARMAR.  And the fraud continues.

6.     On October 17, 2019, Mr. Worms was held in contempt for refusing to produce

discovery in violation of Orders dated July 30 and August 6, 2019.  Today, he not only

continues to be in contempt of these orders, he is also in contempt of the Contempt Order,

brazenly refusing to pay fines ordered by the Court.

7.     This action seeks to recover some of the $2 billion embezzled by Markus, which

was fraudulently conveyed with Bykov's assistance, as well as other funds owned by Markus,

including the $5 million-plus which Bykov obtained using the collusive BG Atlantic judgment

in order to foreclose on Markus' London properties held in Markus' name and put the proceeds

out of reach of her creditors.

8.     The *Bank* FR and *Markus* FR bring claims for fraudulent conveyance,

compensation of harm, turnover, unjust enrichment, and other relief under New York law, the

Bankruptcy Code, and Russian law.  *See* Appendix A (Russian Law) attached hereto.  These

claims are without prejudice to actions that the *Markus* Trustee may take under Sections 1507

and 1521 of the Bankruptcy Code for turnover of Markus' assets from Bykov and others.

## II.    JURISDICTION AND VENUE

9.     This Court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C.

§§1509(b), 11 U.S.C. §§1521(a)(5) and (a)(7), 28 U.S.C. §§157 and 1334 and the Amended

3

Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).

**10.**     This adversary proceedings is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(E), (H), (O) and (P).  Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedures, Plaintiffs consent to the entry of final orders and judgment by this Court in the event it is determined that any part of this adversary proceeding is non-core, or that the Bankruptcy Judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**11.**     Venue is proper in this district pursuant to 28 U.S.C. §§1409(a) and 1410.

### III.   THE PARTIES

#### A.     PLAINTIFFS

**12.**     Plaintiff Yuri Rozhkov, the *Markus* FR, is a Russian citizen and resident of Russia.  He brings this action in his capacity as *Markus* FR for the benefit of the Markus Russian bankruptcy estate and her creditors.

**13.**     Plaintiff DIA, the *Bank* FR, is an agency organized and existing under the laws of Russia.  It brings this action in its capacity as the *Bank* FR for the benefit of the Bank and its creditors.

#### B.     DEFENDANTS

**14.**     Defendant LARMAR is a foundation organized under the laws of Panama with a principal place of business in New York, New York.  Markus is the primary beneficiary of LARMAR.  Markus's grandson, Sergey Markus, and her brother, Georgy Bedzhamov, are beneficiaries of LARMAR.

**15.**     Defendant Bykov is an individual with a principal place of business in New York, New York.  He is the "Protector" of LARMAR, co-Trustee of the LM Trust, and a director or officer of Markus' limited liability companies and corporations as set forth below. He is also Markus' accountant and financial administrator.

4

16.     Defendant BG Atlantic is a corporation organized and existing under the laws of New York with a principal place of business in New York, New York.

17.     Defendant LM Property Management LLC ("**LM Property LLC**") is a limited liability company organized and existing under the laws of New York with a principal place of business in New York, New York.  On or about June 24, 2008 Markus set up LM Property LLC and she was registered as its sole member.  Bykov was its Director.

18.     Defendant LM Realty 31B, LLC ("**LM 31B LLC**")[1] is a limited liability company organized and existing under the laws of New York with a principal place of business in New York, New York.  On or about May 27, 2010, Markus set up LM 31B LLC and she was registered as its sole member.  Bykov was its Director.

19.     Defendant LM Realty 27D, LLC ("**LM 27D LLC**") is a limited liability company organized and existing under the laws of New York with a principal place of business in New York, New York.  On or about May 27, 2010, Markus set up LM 27D LLC and she was registered as its sole member.  Bykov was its Director.

20.     Defendant LM Realty 24C, LLC ("**LM 24C LLC**") is a limited liability company organized and existing under the laws of New York with a principal place of business in New York, New York.  On or about May 27, 2010, Markus set up LM 24C LLC and she was registered as its sole member.  Bykov was its Director.

21.     Defendant LM Realty 23H, LLC ("**LM 23H LLC**") is a limited liability company organized and existing under the laws of New York with a principal place of business in New York, New York.  On or about June 21, 2010, Markus set up LM 23H LLC and she was registered as its sole member.  Bykov was its Director.

22.     Defendant LM Realty 20A, LLC ("**LM 20A LLC**") is a limited liability

---

[1] This and seven other LM LLC entities are eponymously named after Larisa Markus and for seven LLCs, their names correspond to the properties' apartment numbers.

5

company organized and existing under the laws of New York with a principal place of business in New York, New York. On or about June 21, 2010, Markus set up LM 20A LLC and she was registered as its sole member.

23.    Defendant LM Realty 18 West, LLC ("**LM 18W LLC**") is a limited liability company organized and existing under the laws of New York with a principal place of business in New York, New York. On or about October 16, 2012, Markus set up LM 18W LLC and she was registered as its sole member. Bykov was its Director.

24.    Defendant LM Realty 10C, LLC ("**LM 10C LLC**") is a limited liability company organized and existing under the laws of New York with a principal place of business in New York, New York. On or about March 20, 2015, Markus had set up One Riverside Park Realty, LLC ("**One Riverside**"), and she was registered as its sole member. Bykov was its Director. On or about April 7, 2015, One Riverside was renamed LM 10C LLC.

25.    The eight Defendant LLCs listed above are referred to collectively herein as "**LM LLCs**."

26.    Defendant Innovative Construction Group, Inc. ("**ICG**") is a corporation organized and existing under the laws of New York with a principal place of business in New York, New York. Markus incorporated ICG on or about March 16, 2004. She was the 100% shareholder of ICG and registered as its Director. The day after incorporation, on March 17, 2004, Markus appointed Bykov to serve as Director of ICG. ICG is owned either by Markus or the LM Trust. To the extent it was owned by the LM Trust, the LM Trust has been revoked and ownership reverted to Markus and is now administered by the *Markus* FR. On July 27, 2018 Bykov appointed ICG to act as Foundation Council of LARMAR, similar to a manager.

27.    Defendant First Integrated Construction, Inc. ("**FIC**") is a corporation organized and existing under the laws of New York with a principal place of business in New York, New York. Markus incorporated FIC on or about March 10, 2004. She was the 100%

shareholder of FIC and registered as its Director.  On an unknown date Markus appointed Bykov to serve as Director of FIC.

28.    Defendants LM LLCs, ICG and FIC listed above are referred to collectively herein as the "**LM Entities**."

29.    Defendant Larisa Markus ("**Markus**") is a Russian citizen and resident of Moscow, Russia. Markus was one of the founders and shareholder of Vneshprombank, the Bank, previously one of Russia's largest banks.  Markus pled guilty in 2015 and is currently serving her sentence for embezzlement of the Bank's funds in a Russian prison.

### C.    RELATED PARTIES

30.    The LM Trust (a New York revocable trust) was created on February 14, 2011. Markus is the LM Trust's Grantor, Trustee, and lifetime beneficiary; Bykov is the co-Trustee. Markus' grandson, Sergey Markus, and her brother, Georgy Bedzhamov, are its remainder beneficiaries.  The LM Trust has been revoked and is now administered by the *Markus* FR.

31.    550 Park Avenue, LLC ("**550 Park**") is a limited liability company organized and existing under the laws of New York with a principal place of business in New York, New York.  On or about June 20, 2013 Markus set up 550 Park and she was registered as its sole member.  Bykov was its Director.  The Court ruled that 550 Park is owned by Markus and is now administered by the *Markus* FR.

32.    Protax Services, Inc. is a New York company providing tax and legal support to expatriates and foreign nationals and is controlled by Bykov. It operates from offices located in New York, New York, and Miami, Florida, under the trade name "Protax Services, Inc.".

33.    Protax Services, Corp. is an entity organized and existing under the laws of New York with a principal place of business in New York, New York. It was organized on or about December 31, 1986.  Bykov is its CEO.

34.    Protax Services Consulting, Inc. is an entity organized and existing under the

laws of Florida with a principal place of business in Miami, Florida. It was organized on or about October 6, 2015, Bykov is its registered agent and Principal.

35.     Prolegal International, Inc. is an entity organized and existing under the laws of Delaware with a principal place of business in New York, New York. It was organized on or about September 6, 2016.  Upon information and belief, it is controlled by Bykov.

36.     Protax Services, Inc., Protax Services Corp., Protax Services Consulting, Inc., Prolegal International, Inc. and Bykov are referred to collectively herein as "**Protax Entities**."

## IV.   PROCEDURAL BACKGROUND

### A.   MARKUS EMBEZZLES OVER $2 BILLION AND PLEADS GUILTY

37.     The Bank was incorporated as a limited liability company under the laws of the Russian Federation in July 1995.  The Bank's headquarters are located in Moscow and, until its banking license was revoked in January 2016, the Bank operated in seven regions of Russia.

38.     Markus served as the Bank's President from September 29, 1995 to July 19, 2016.  She also served as a member of the Bank's Managing Board and Board of Directors.

39.     On December 22, 2015, Markus was arrested on suspicion of a "large-scale" fraud orchestrated by embezzling money from the Bank.  The Russian Khamovnichesky District court of Moscow determined that starting not later than May 2009, Markus, with accomplices, perpetrated a large-scale fraud by embezzling funds from Vneshprombank.

40.     When Markus was losing her control of the Bank, she arranged for the destruction of much of the Bank's financial and other documentation.

41.     Markus pled guilty to embezzlement and fraud, was convicted on May 12, 2017 and sentenced to nine years of imprisonment.  Markus appealed her sentence and on August 15, 2017, the Judicial Division for Criminal Cases of the Moscow City Court upheld the conviction, but decreased her imprisonment term to eight years and six months.

42.     According to her criminal conviction, from not later than May 2009 through

December 2015, Markus and her accomplices embezzled not less than $2,525,946,596.43 in at least 1,313 transactions, as follows:

| No. | Year | Dollar Amounts | No. of Embezzling Transactions |
|---|---|---|---|
| 1 | 2009 | $11,082,129.59 | 16 |
| 2 | 2010 | $2,500,000.00 | 4 |
| 3 | 2011 | $84,635,318.17 | 25 |
| 4 | 2012 | $287,200,652.13 | 72 |
| 5 | 2013 | $463,712,036.11 | 171 |
| 6 | 2014 | $682,963,437.65 | 293 |
| 7 | 2015 | $993,853,022.78 | 732 |
| | | **$2,525,946,596.43** | **1,313** |

### B.     THE BANK'S RUSSIAN INSOLVENCY PROCEEDINGS

**43.**     On December 18, 2015, the Central Bank of Russia (regulator of the banking industry in Russia), appointed a temporary administrator to oversee the Bank.

**44.**     On January 21, 2016 the Central Bank of Russia decided against rehabilitating the Bank and revoked its license.

**45.**     On March 11, 2016, the Moscow Arbitrazh Court declared the Bank insolvent and commenced the Russian insolvency proceeding of the Bank.  The Court appointed DIA as the trustee for the Bank.

**46.**     On March 28 and August 15, 2017, the Bank obtained judgments against Markus in the amount of $15.2 million and $1.7 billion, respectively, in Russian courts.

**47.**     Under Russian law, the *Bank* FR has standing to bring claims on behalf of or in the interests of the Bank's creditors.

**48.**     Particularly, under Russian Bankruptcy law, Article 20.3, Sections 1 and 2; Article 129, Sections 2 and 3; Article 189.78, Sections 3, 4 and 5, the *Bank* FR as a trustee shall (and/or shall be entitled to) take measures aimed at search, identification and return of the debtor's property from third parties and to procure the debtor's property, apply to court with motions and applications, plead cases in courts relating to property rights of the debtor, including for reclaiming or transfer of property of the debtor or to the debtor's favor, on

recovery of debts of third parties, recovery of damages, avoidance of transactions and application of consequences of invalidity of void transactions, specific performance (including provision of documents),[2] and conduct other actions provided for by statutes and other statutory instruments of the Russian Federation and aimed at return of the debtor's property.

49.     Therefore, the *Bank* FR has standing to bring claims on behalf of or in the interests of the Bank's creditors for avoidance of fraudulent transfers, recovery of damages, recovery of unjust enrichment, for specific performance in the form of provision of information (accounting) in respect of the Bank's property, appointing a receiver and other claims aimed at search, identification, preservation and return of the Bank's property.

### C.     THE *BANK* RECOGNITION ORDER

50.     On December 19, 2016, the *Bank* FR filed a *Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceeding* ("**Bank Chapter 15 Petition**").

51.     After a February 10, 2017 hearing, this Court issued an *Order Granting Recognition and Relief in Aid of a Foreign Main Proceeding Pursuant to 11 U.S.C. §§ 105(a), 1517, 1520 and 1521* on February 15, 2017 ("**Bank Recognition Order**").

52.     The *Bank* Recognition Order, *inter alia*: (a) recognized the Bank's Russian Insolvency Proceeding; (b) afforded to the *Bank* FR "all relief afforded to a foreign main proceeding pursuant to 11 U.S.C. §1520; (c) ordered that "11 U.S.C. §§361 and 362 apply with respect to the Bank and the property of the Bank that is currently within, or may be brought in, the territorial jurisdiction of the United States …."; and (d) authorized the *Bank* FR to, *inter alia*, "examine witnesses and take evidence concerning the Bank's assets, affairs, rights, obligations or liabilities…."

53.     One of the effects of the *Bank* Recognition Order was to impose an automatic stay against any transfers of property of the Russian bankruptcy estates of those foreign debtors

---

[2] This particular power is based on Russian Civil Code, Article 308.3.

within the territorial jurisdiction of the United States.

54.     On October 8, 2019, this Court denied Markus' motion to vacate the *Bank Recognition Order*.

### D.     MARKUS' RUSSIAN INSOLVENCY PROCEEDINGS

55.     On April 19, 2016, Russian Bank VTB 24 filed an application for the commencement of bankruptcy proceeding against Markus, which was granted on April 22, 2016 by the Moscow Arbitrazh Court.  On October 18, 2016, the Moscow Arbitrazh Court initiated a debt-restructuring procedure and appointed Yuri Rozhkov as Markus' financial administrator.

56.     On May 25, 2017 the Moscow Arbitrazh Court appointed Yuri Rozhkov as Markus' financial administrator to preside over the liquidation of Markus' assets.

57.     Under Russian law, the *Markus* FR has standing to bring claims on behalf of Markus' creditors.

58.     Particularly, under Russian Bankruptcy law, Article 20.3, Sections 1 and 2; Article 129, Sections 2 and 3; Article 213.25, Section 6, the *Markus* FR as a financial trustee shall (and/or shall be entitled to) take measures aimed at search, identification and return of the debtor's property from third parties and to procure the debtor's property, apply to court with motions and applications, plead cases in courts relating to property rights of the debtor, including for reclaiming or transfer of property of the debtor or to the debtor's favor, on recovery of debts of third parties, recovery of damages, avoidance of transactions and application of consequences of invalidity of void transactions, specific performance (including provision of documents),[3] and conduct other actions provided for by statutes and other statutory instruments of the Russian Federation and aimed at return of the debtor's property.

59.     Therefore, the *Markus* FR has standing to bring claims on behalf of or in the

---

[3] This particular power is based on Russian Civil Code, Article 308.3.

interests of Markus' creditors for avoidance of fraudulent transfers, recovery of damages, recovery of unjust enrichment, for specific performance in the form of provision of information (accounting) in respect of Markus' property, appointing a receiver and other claims aimed at search, identification, preservation and return of Markus' property.

### E.    THE *MARKUS* RECOGNITION ORDER

**60.**    On January 10, 2019, the *Markus* FR filed a *Verified Petition Under Chapter 15 for Recognition of Foreign Main Proceeding* ("***Markus* Chapter 15 Petition**").

**61.**    After a February 27, 2019 hearing, this Court issued an *Order Granting Recognition and Relief in Aid of a Foreign Main Proceeding Pursuant to 11 U.S.C. §§ 105(a), 1517, 1520 and 1521* on April 1, 2019 ("***Markus* Recognition Order**").

**62.**    The *Markus* Recognition Order, *inter alia*: (a) recognized Markus' Russian Insolvency Proceeding; (b) afforded to the *Markus* FR "all relief afforded to a foreign main proceeding pursuant to 11 U.S.C. §1520; (c) ordered that "pursuant to 11 U.S.C. § 1520(a)(1), sections 361 and 362 of the Bankruptcy Code apply with respect to the Debtor and the property of the Debtor currently within or that may be brought into the territory and jurisdiction of the United States...."; and (d) authorized the *Markus* FR to, *inter alia*, "examine witnesses and take evidence concerning the Debtor's assets, affairs, rights, obligations or liabilities ...."

**63.**    One of the effects of the *Markus* Recognition Order was to impose the automatic stay against any transfers of property of the Russian bankruptcy estates of those foreign debtors within the territorial jurisdiction of the United States.

**64.**    On October 8, 2019, this Court denied Markus' motion to vacate the *Markus* Recognition Order.

### V.   MARKUS' FRAUD IN THE UNITED STATES

### A.    MARKUS' KNOWN REAL ESTATE ASSETS IN NEW YORK

**65.**    On or about June 26, 2008, Markus purchased in her name apartment 31B located on 10 West End Avenue, New York, NY ("**Apartment 31B**") for $2,342,178.65.

66.     On or about October 30, 2008, Markus purchased in her name apartment 31C located on 10 West End Avenue, New York, NY ("**Apartment 31C**") for $3,029,293.75.

67.     On or about May 27, 2009, Markus purchased in her name apartment 27D located on 10 West End Avenue, New York, NY ("**Apartment 27D**") for $1,350,000.

68.     On or about February 26, 2010, Markus was assigned a purchase agreement for apartment 24C located on 40 Broad Street, New York, NY ("**Apartment 24C**").  On or about March 31, 2011, Markus assigned the Apartment 24C purchase agreement to LM 24C LLC for no consideration.  On or about April 21, 2011, LM 24C LLC purchased Apartment 24C for $474,102.55.

69.     On June 7, 2010, Markus signed the purchase agreement with regard to apartment 23H located on 40 Broad Street, New York, NY ("**Apartment 23H**").  At an unknown date Markus assigned the purchase agreement to LM 23H LLC, which purchased Apartment 23H on April 21, 2011 for $1,134,187.36.

70.     On June 7, 2010 Markus signed the purchase agreement with regard to apartment 20A located on 40 Broad Street, New York, NY ("**Apartment 20A**").  At an unknown date Markus assigned the purchase agreement to LM 20A LLC, which purchased Apartment 20A on April 21, 2011 for $781,253.31.

71.     On October 23, 2012 Markus, acting as the sole member of LM 18W LLC, authorized Steven J. Goldstein to purchase apartment 26A located on 18 West 48th Street, New York, NY ("**Apartment 26A**").  On November 29, 2012 LM 18W LLC purchased Apartment 26A for $2,165,000.

72.     On January 31, 2014 Markus signed the purchase agreement with regard to apartment 10C located on 50 Riverside Boulevard, New York, NY ("**Apartment 10C**").  On October 1, 2015 Markus assigned the purchase agreement to LM 10C LLC, which purchased Apartment 10C on December 4, 2015 for $5,095,250.

73.    Markus' direct or indirect ownership of real estate in New York can be summarized as follows:

| No. | Apartment | Initial Purchase/ Subsequent Transfer Date | Purchaser/Transferee | Amount |
|---|---|---|---|---|
| 1 | Apartment **31B**, 10 West End Avenue, New York, NY | May 2, 2008 | Markus | **$2,342,178** |
| | | August 31, 2010 | LM Realty 31B, LLC | No known consideration |
| 2 | Apartment **31C**, 10 West End Avenue, New York, NY | August 7, 2008 | Markus | **$3,029,293** |
| | | August 31, 2010 | LM Property Management, LLC | No known consideration |
| 3 | Apartment **27D**, 10 West End Avenue, New York, NY | May 18, 2009 | Markus | **$1,350,000** |
| | | August 31, 2010 | LM Realty 27D, LLC | No known consideration |
| | | July 2015 (**SOLD**) | Sumauma Properties, LLC | **$2,200,000** |
| 4 | Apartment **24C**, 40 Broad Street, New York, NY | February 26, 2010 | Markus | **$467,555** |
| | | March 31, 2011 | LM Realty 24C, LLC | No known consideration |
| | | (**SOLD**) | | |
| 5 | Apartment **20A**, 40 Broad Street, New York, NY | June 7, 2010 | Markus | **$781,253** |
| | | Between June 2010 and April 2011 | LM Realty 20A, LLC | No known consideration |
| | | (**SOLD**) | | |
| 6 | Apartment **23H**, 40 Broad Street, New York, NY | June 7, 2010 | Markus | **$1,134,187** |
| | | Between June 2010 and April 2011 | LM Realty 23H, LLC | No known consideration |
| 7 | Apartment **26A**, 18 West 48th Street, New York, NY | October 25, 2012 | LM Realty 18 WEST, LLC | **$2,165,000** |
| | | April 7, 2016 (**SOLD**) | Reuben Mordechay | **$2,572,000** |
| 8 | Apartment **10C**, 50 Riverside Boulevard, New York, NY | January 31, 2014 | Markus | **$5,095,250** |
| | | Unknown Date | LM Realty 10C, LLC | No known consideration |

## B.    BYKOV'S ROLE

74.    Bykov is Markus' trusted accountant and financial administrator.    He has conspired with Markus and aided and abetted her misconduct, including:

a.    Bykov managed the fraudulent transfer of LM Entities to the LM Trust and LARMAR;

14

   b.  Bykov stonewalled discovery from 2017 onward;

   c.  Bykov concealed Markus' assets in discovery, including her properties in England, France, and Latvia from 2017 onward;

   d.  Bykov orchestrated the collusive BG Atlantic judgment in 2017 and then, disregarding the fiduciary duties he owed Markus under powers of attorney, enforced the judgment in England taking over $5 million in 2019 in an attempt to put the funds beyond the reach of Markus' creditors;

   e.  Bykov secretly arranged to transfer over $5 million from the sale of Markus' London properties to the LM Trust in March 2019, then dissipated about $1 million, and tried to conceal the balance of those funds in 550 Park;

   f.  Bykov engaged in several ham-handed efforts to transfer Markus' assets in the United States to make it more difficult for the FRs to recover the property for creditors;

   g.  Bykov took out secret loans against Markus' life insurance policies, which were owned by the LM Trust, and then dissipated more than $400,000 in loan proceeds to his companies Protax Services, Inc., Protax Services Corp. and Prolegal International Inc.; and

   h.  Bykov paid himself hundreds of thousands of dollars in self-dealing management, accounting, and other fees from the LM Entities.

75.    This action seeks to recover the damages caused by Bykov to the Bank's and Markus's creditors.

### C.    MARKUS CREATES THE LM TRUST TO DEFRAUD CREDITORS

76.    On February 14, 2011, Markus settled the LM Trust. She is the Grantor, Trustee, and the lifetime beneficiary of the LM Trust. Bykov is the co-Trustee. The LM Trust Agreement provides that upon Markus' death the property of the LM Trust shall be distributed

to two beneficiaries – Sergey Markus (Markus' grandson) and Georgy Bedzhamov (Markus' brother).

77.    On the same day that Markus settled the LM Trust in New York, according to documents produced by Bykov, she transferred with no consideration 100% interest in ICG to the LM Trust.  Later, Markus purportedly and fraudulently transferred 100% interest in ICG to LARMAR at an unknown date, but apparently in 2019 (according to Bykov).

78.    Also, that same day, February 14, 2011, Markus transferred to ICG 5% of her interests in LM Property LLC, LM 31B LLC and LM 27D LLC, each initially 100% owned by Markus.

79.    Later, at an unknown date, Markus transferred to ICG 5% of her interests in LM 18 West LLC, LM 20A LLC, LM 23H LLC, LM 24C LLC and LM 10C LLC, each initially 100% owned by Markus.

80.    These transfers were designed to defraud Markus' creditors.

### D.    MARKUS CREATES LARMAR TO DEFRAUD CREDITORS

81.    On or about August 29, 2008, Markus settled LARMAR – a Panamanian trust in which she is the primary lifetime beneficiary and Bykov is the Protector (a position similar to the Trustee in a US trust).  Sergey Markus (Markus' grandson) and Georgy Bedzhamov (Markus' brother) are secondary beneficiaries of LARMAR entitled to certain distributions upon the death of the primary beneficiary (Markus).

82.    On February 14, 2011 Markus transferred to LARMAR for no consideration 95% of her interests in LM Property LLC, LM 31B LLC and LM 27D LLC, each initially 100% owned by Markus.

83.    At an unknown date, Markus transferred to LARMAR 95% of her interests in LM 18W LLC, LM 20A LLC, LM 23H LLC, LM 24C LLC and LM 10C LLC, each initially 100% owned by Markus.

16

84.     These transfers were designed to defraud Markus' creditors.

85.     ICG and FIC were purportedly and fraudulently transferred to LARMAR at an
unknown date, but apparently in 2019 (according to Bykov).

### E.     MARKUS' CONCEALMENT OF ASSETS IN RESPONSE TO DISCOVERY

86.     Since October 2017, the *Bank* FR and later *Markus* FR served discovery to
obtain disclosure of all assets owned by Markus, LM Entities and Protax Entities.  However,
LM and Protax Entities (Bykov) and/or Markus concealed the assets owned by her both within
and outside the United States.

87.     LM and Protax Entities (Bykov) and/or Markus concealed that, apart from the
U.S. assets, she owned property in France, Latvia and UK.  The FRs learned the details of such
assets through its own investigation and discovery obtained from third parties in 2018-2019
and only after many of the assets had been dissipated through the actions orchestrated by
Bykov.

88.     Since 2011, LM Trust maintained life insurance for Markus with Lincoln
Benefit Life.  On February 2, 2017, Bykov, acting on behalf of the LM Trust, applied to Lincoln
Benefit Life for a "maximum loan available."  On February 9, 2017, the LM Trust received a
loan in the amount of $389,026.15, a portion of which was later wired to Bykov's entities
Protax Services Inc. and Prolegal International Inc.  The FRs only learned of this transfer from
documents produced by Lincoln Benefit Life.  The *Bank* FR had subpoenaed banks where the
LM Entities maintained accounts.  The bank documents revealed that the LM Trust made
payments to Lincoln Benefit Life.  On January 14, 2019, the *Bank* FR served a subpoena on
Lincoln Benefit Life and received production on February 27, 2019.  The *Bank* FR learned
about the loan against the policy from the Lincoln Benefit Life documents.

89.     Since 2011, the LM Trust maintained life insurance for Markus with Accordia
(ex. Aviva) Life and Annuity Company.  On February 1, 2019, Bykov, acting on behalf of the

LM Trust, applied to Accordia for a "maximum loan available." On February 8, 2019, the LM Trust received a loan in the amount of $457,042.14. Bykov then transferred over $400,000 to the accounts of some Protax Entities. The FRs only learned of this from the documents produced by Markus' insurance agent, Alex Glushanok. The *Bank* FR had subpoenaed banks where LM Entities maintained accounts. The bank documents revealed that LM Trust made payments to Accordia (ex. Aviva) Life and Annuity Company. On January 17, 2019 the *Bank* FR served a subpoena on Accordia and received production on January 29, 2019. The Accordia documents revealed that Mr. Glushanok acted as Markus' insurance agent. A subpoena was served on him on February 20, 2019. Mr. Glushanok produced responsive documents on April 10, 2019, from which the FRs learned about the loan taken from Accordia on February 8, 2019.

90.    As directed by the *Protective Order Governing Confidentiality of Discovery Materials* (*Bank* ECF 80, *Markus* ECF 43), the *Bank* FR copied the attorneys for the LM and Protax Entities on the subpoenas served on the insurance companies and Markus' insurance agent, as well as shared the produced documents, so they were well aware that by April 10 the *Bank* FR already had some information about the loans taken against the insurance policies. The LM and Protax Entities did not produce documents until May 7, 2019, related to the two insurance policies and the loans taken against them in 2017 and 2019.

91.    The *Bank* FR learned through documents accidentally left at the Bank after Markus had been removed that Markus had formed at least three Nevis companies: Jadonica Limited, Alcorta Investments Limited, and Fortitude Investments Inc. The LM and Protax Entities only produced documents concerning these entities on January 25, 2019, only after the *Bank* FR disclosed its knowledge about the existence of these companies.

92.    Through investigation, the FRs learned that Markus and LM Entities 550 Park, LM 18W LLC, and LM Property LLC invested over $1.3 million in at least six separate investment projects of The Bluestone Group ("**Bluestone**"). Again, the LM Entities produced

the documents related to these investments on January 14, 2019, only after they received a copy

of the *Bank* FR's subpoena served on Bluestone.

### F.   BYKOV'S "HAM-HANDED" BACKDATING OF DOCUMENTS DURING THE BANKRUPTCY TO IMPEDE THE FRS' EFFORTS

93.    On October 3, 2019, facing the threat of losing control over the LM Trust and

550 Park, Bykov submitted a supplemental declaration to the Court purportedly to "correct[] a

previous misstatement" concerning the ownership of 550 Park, another entity owned by

Markus.   Bykov claimed that 550 Park was owned 100% by LARMAR pursuant to an

assignment dated over three years earlier "as of June 23, 2016." Bykov stated in his declaration

that the "assignment was *only just recently executed*" by him.

94.    On October 17, 2019, Bykov's counsel, Daniel Singer, filed a letter with the

Court with yet another Bykov declaration.  This Bykov declaration provided that Bykov was

"'withdrawing' the assignment that he executed purporting to evidence the transfer of Markus'

interest in 550 Park to the Larmar Foundation."   The original declaration was an obvious

falsification; 550 Park had never been transferred to LARMAR.

95.    The *Bank* FR (since October 2017) and later *Markus* FR demanded production

of tax returns of the LM Entities.  Some tax returns were produced only in June 2019, others

were provided even later in October 2019.  All tax returns were prepared by Bykov, who filed

and then amended the returns to create confusion as to the ownership of the entities.   For

instance, the original tax returns for FIC and ICG for 2007 through 2017 showed they were

100% owned by Markus.  Bykov did not show in the tax returns that the entities had allegedly

been transferred to LM Trust in 2011.  In an attempt to move the assets further from Markus'

creditors, on September 19, 2019, Bykov filed "amended" tax returns showing that both FIC

and ICG are 100% owned by LARMAR (Panamanian trust).  The 2019 tax returns are an

obvious fabrication; FIC and ICG were never owned by LARMAR.  Further, upon information

and belief, Bykov has tax returns for 550 Park which show Markus' ownership, which he is concealing.

### G.    BYKOV CREATES BG ATLANTIC TO FRAUDULENTLY TRANSFER MARKUS' ASSETS TO HINDER CREDITORS

96.     **BG Atlantic:**  On October 25, 2016, New York corporation BG Atlantic was set up allegedly by Boris Granik ("**Granik**"), who was shown as the incorporator and CEO of the entity.  Granik died on November 20, 2017.

97.     Upon information and belief, incorporation of BG Atlantic and further actions related to that company were orchestrated and directed by Bykov to benefit himself and assist Markus to conceal her assets from creditors.

98.     **The Collusive Judgment:**  On or about November 9, 2016, within weeks after it was formed, BG Atlantic filed a complaint in the Supreme Court of the State of New York claiming that it was assigned a debt in the amount of $5,225,816.34 incurred by Markus based on an unspecified oral agreement between Markus and an undisclosed creditor.

99.     On or about December 20, 2016, BG Atlantic and Markus filed with the Supreme Court a settlement agreement by which Markus agreed to pay the outstanding debt in the amount of $4.7 million within five days upon execution of the settlement agreement and with the understanding that any judgment would not be enforced against her U.S. assets.

100.     On or about January 3, 2017, BG Atlantic informed the Court that Markus defaulted under the settlement agreement and requested entry of a judgment against her in the amount of $4.7 million.  The Court issued the requested judgment on January 9, 2017 ("**NY Judgment**").

101.     Bykov not only controlled BG Atlantic while still acting for Markus, but he also used Markus' funds to pay for BG Atlantic's lawyers in the New York State Court litigation.

102.     Upon information and belief, the BG Atlantic-related actions are a collusive fraud designed to hinder Markus' creditors and to enrich Bykov.

20

**103.    Bykov Becomes BG Atlantic Director**:  On December 27, 2017, Granik's widow – Ludmila Granik, purportedly the sole shareholder of BG Atlantic – appointed Granik's son, Alfred Granik, as the Director of BG Atlantic and, on June 6, 2018, replaced him with Bykov, who also managed the bank accounts of BG Atlantic in the U.S. and controlled the money transferred to and from BG Atlantic, including into his own pocket.   Upon information and belief, all of this was orchestrated by Bykov.

**104.    The Secret Enforcement Proceedings**: Starting on or around November 2017, BG Atlantic enforced or attempted to enforce the NY Judgment in multiple foreign jurisdictions against the assets of Markus.   In particular, BG Atlantic through Bykov enforced the NY Judgment against at least twelve properties of Markus in Latvia between November 2017 and July 2018, two properties in France on or about September 2018, and three properties in England in 2018-2019.  Upon information and belief, BG Atlantic learned of these properties through Bykov.

**105.**    Upon information and belief, BG Atlantic recovered or attempted to recover over $7 million in various jurisdictions in satisfaction of its "judgment" for $4.7 million. Notably, BG Atlantic did not take any action to enforce its "judgment" against Markus' assets in the United States.

**106.**    In its pursuit to make double or even triple recovery, BG Atlantic failed to disclose in respective courts in various jurisdictions its prior attempts to recover and the recoveries it made in other jurisdictions.

**107.    Bykov's Conflicting Roles**:  In each jurisdiction, Bykov acted on behalf of both BG Atlantic and Markus, engaging attorneys and agents to deal with the enforcement and subsequent sale of properties.

**108.**    Thus, in the UK action enforcing the NY Judgment, an English attorney, Irene Dallas of Dallas & Co Solicitors, confirmed that she was receiving instructions from Bykov

acting on behalf of BG Atlantic, while Bykov also acted on behalf of Markus under a Power of Attorney issued by Markus.

109.    While directing BG Atlantic, Bykov caused it to file the Particulars of Claim with the Statement of Truth purportedly signed by Granik on December 1, 2017 in England. But, Granik had died in New Jersey on November 20, 2017.

110.    **BG Atlantic's Failure to Respond to Subpoenas:**  On or about January 14, 2019, the *Bank* FR served a subpoena on BG Atlantic. On or about September 6, 2019, *Markus* FR served subpoena on Bykov, Protax Services, Inc. and Protax Services Consulting, Inc. requesting documents regarding BG Atlantic.  Nonetheless, neither BG Atlantic, nor Bykov, nor his Protax Entities, have responded to the subpoenas.  The actions are part of the effort to conceal what occurred with BG Atlantic.

### H.    THE FR'S DISCOVERY OF MARKUS' FRAUDULENT CONVEYANCES

111.    Markus never disclosed the existence of LM Entities, France, Latvian, or UK assets within the proceedings pending in Russia, *i.e.*, her own bankruptcy, the Bank's bankruptcy and the criminal proceedings.

112.    The *Bank* FR learned about the existence of LM Entities in mid-2016 after the Bank discovered that it was named as a Defendant by Panabroker Protecting and Indemnity Association, S.A. – an alleged creditor who brought an action against LM Entities and the Bank in SDNY.  The case was dismissed on November 3, 2017.

113.    On December 19, 2016, the *Bank* FR commenced a Chapter 15 proceeding.  On October 17, 2017, after the court denied the LM Entities' motion to quash, the *Bank* FR served subpoenas on LM Entities.

114.    On November 22, 2017, the *Bank* FR received the first batch of documents responsive to the October 17 subpoenas.  From those documents, the *Bank* FR first learned that Markus had allegedly transferred her ownership of the LM LLCs to ICG and LARMAR.

## I.    DISCOVERY OF THE LONDON FUNDS AND REVOCATION OF THE LM TRUST

115.    On October 17, 2017, the *Bank* FR served subpoenas on LM and Protax Entities requiring them to produce documents identifying all assets of Markus, as well as disclose all assets of the LM Trust.  The *Markus* FR also served subpoenas on LM  and Protax Entities for production of documents concerning all assets of Markus and the LM Trust.

116.    The LM and Protax Entities never produced documents evidencing that Markus owned real property in England, which was administered by Bykov pursuant to Markus' Power of Attorney ("**POA**"), until after the FRs disclosed their knowledge of such properties.

117.    On May 20, 2019, JPC Law, on behalf of Markus, disclosed in English proceedings related to Markus that the sale of her English property netted approximately **£4,158,410.03** – equal to **$5,286,594.99** ("**UK Proceeds**").  On or about March 29, 2019, Bykov caused the transfer of the UK Proceeds to the JP Morgan Chase New York bank account of the LM Trust.[4]  On May 24, 2019, Bykov caused $3 million of the UK Proceeds to be transferred from the LM Trust to the bank account of 550 Park.

118.    Once the *Markus* FR learned of the transfer of the UK Proceeds to the LM Trust account in New York, he revoked the LM Trust on May 27, 2019.

119.    The next day, May 28, 2019, the *Markus* FR submitted his *Emergency Motion to Enforce the Recognition Order and Entrust the Assets of the LM Trust to the Administration of the Markus FR* with an Order to Show Cause (*Markus* ECF 81-12).  At a hearing on May 29, 2019, Judge Vyskocil entered an order freezing the UK Proceeds.

120.    On September 8, 2019, the *Markus* FR executed a second document revoking

---

[4]  The LM Trust (then under Bykov's control), as well as Bykov and Protax Entities, never disclosed receipt of the UK Proceeds, despite the April 1, 2019 *Markus* Recognition Order – "so ordered" on February 27, 2019 – requiring supplementation of prior productions including, *inter alia*, bank statements and documents related to assets and their transfers.  *Markus* Recognition Order (*Markus* ECF 29), at 10.

the LM Trust.

121.    On October 23, 2019,  this Court "conclude[d] that the revocation of the LM

Trust was effective on May 27, 2019."

122.    The Court, on October 23, stated, "It is now time to bring this charade to an end,

starting with the turnover of property in the LM Trust, now properly revoked by the [*Markus*

FR]," and granted the *Markus* FR's Turnover Motion.  The Court ordered:  "The turnover of

all property covered by this Opinion shall be completed within 14 days from the date of this

Opinion and Order."

### J.    THE BADGES OF FRAUD RELATED TO THE TRANSFER OF MARKUS' ASSETS TO THE LM TRUST AND LARMAR

123.     Markus' transfers of 5% in each of the LM LLCs to ICG (owned by the LM

Trust) and purported and fraudulent transfer of ICG and FIC to LARMAR at an unknown date,

apparently in 2019, were made with the actual intent to hinder, delay, and/or defraud creditors.

124.    Numerous badges of fraud support the conclusion that Markus transferred assets

with the actual intent to hinder, delay, and/or defraud creditors, including:

> a.    Lack of consideration: The LM LLCs were conveyed for no value to ICG
>
> and LARMAR, and ICG and FIC were purportedly conveyed for no value
>
> to the LM Trust and/or LARMAR;
>
> b.    Family relationship: The LM LLCs were transferred to ICG and LARMAR
>
> and ICG and FIC were purportedly transferred to the LM Trust and/or
>
> LARMAR in which Markus was the trustee and she and her close relatives
>
> are beneficiaries;
>
> c.    Retention of possession, benefit, or use: Markus retained control of the LM
>
> Trust as Trustee (and thus ICG) and LARMAR with Bykov as Protector
>
> (and ICG as the manager) and she also continued to exercise control over
>
> the LM Entities and real estate and other assets that she had put in the trusts;

d.   <u>Financial condition of the party before and after the transaction in question</u>:
Markus transferred assets worth in excess of $15 million to LARMAR,
ICG, and the LM Trust at the same time she was incurring liability of over
$2 billion while embezzling money from the Bank, leaving her with limited
assets in the U.S. in her name;

e.   <u>Cumulative effect of a pattern or series of transactions</u>: Markus was
convicted of embezzling in excess of $2 billion; by the time the transfers
were made to ICG, the LM Trust, and LARMAR in February 2011, she had
embezzled no less than $13.5 million;

f.   <u>General chronology of the events and transactions under inquiry</u>: Markus
had embezzled approximately no less than $13.5 million by 2011, when
transfers were made to ICG, the LM Trust, and LARMAR in February
2011. The LM and Protax Entities then opposed discovery served by the
FRs to learn about these assets from 2017 onward as part of a pattern to
conceal her assets from creditors. Markus never disclosed her beneficial
interests in the LM Trust, LARMAR, and other assets in the United States
to her Russian creditors.

## VI.    <u>CAUSES OF ACTION</u>

### COUNT I

### FRAUDULENT CONVEYANCE
### (UNDER NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 276, 276-A AND 278)
### *BANK* FR AND *MARKUS* FR V. LARMAR AND ICG

**125.**    Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth
herein.

**126.**    Beginning not later than in February 2011, and continuing to an unknown date,
Markus transferred 95% of her interest in the LM LLCs to LARMAR and 5% to ICG. The LM
LLCs were worth in excess of $15 million.

25

127.   ICG and FIC were purportedly and fraudulently transferred to LARMAR at some unknown time, apparently in 2019.

128.   Each of the transfers constituted a conveyance of property with actual intent to hinder, delay, or defraud creditors under Sections 275 and 276 of the New York Debtor and Creditor Law (New York's codification of the Uniform Fraudulent Conveyance Act) ("**NYDCL**"), §§275 & 276.

129.   In addition, the conveyance involving LM 10C LLC no earlier than 2014 was made without fair consideration and at the time the conveyance was made, Markus had incurred, was intending to incur, or believed she would incur, debts beyond her ability to pay them as they matured.

130.   In addition, the alleged conveyances involving ICG and FIC in 2019 to LARMAR were made without fair and consideration and at the time the conveyances were made, Markus had incurred, was intending to incur, or believed she would incur, debts beyond her ability to pay them as they matured.

131.   The *Bank* FR and *Markus* FR are entitled to avoid the fraudulent transfers pursuant to NYDCL §§275, 276 and/or 278.

132.   The *Bank* FR and *Markus* FR are entitled to an Order and Judgment: (a) avoiding and recovering the transfers as fraudulent pursuant to New York Debtor and Creditor Law; (b) setting aside the transfers as fraudulent transfers; and (c) recovering the transfers, or the value thereof, from LARMAR and ICG, plus interest and costs, attorneys' fees and costs under NYDCL §276-a, and/or such other amount as may be determined by the Court.

## COUNT II
### FRAUDULENT CONVEYANCE
### (UNDER NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 276, 276-A AND 278)
### *BANK* FR AND *MARKUS* FR V. BG ATLANTIC AND BYKOV

133.   Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

134.   Beginning in October 2016 with the formation of BG Atlantic, Bykov orchestrated a collusive "judgment" against Markus in the New York Supreme Court (obtained in January 2017), which he then used to bring actions in various jurisdictions abroad (Latvia, France, UK) to recover or to attempt to recover monies to "satisfy" the "judgment."

135.   Bykov engaged in this scheme alone or in collusion with Markus.

136.   To the extent that Bykov and Markus conspired together on this collusive judgment scheme, it rendered Markus further insolvent and was done with actual intent to hinder, delay, or defraud creditors under NYDCL §§275, 276, and 278.

137.   The transfers under this scheme were made without fair consideration and at the time the conveyances were made, Markus had incurred, was intending to incur, or believed she would incur, debts beyond her ability to pay them as they matured.

138.   The *Bank* FR and *Markus* FR are entitled to recover the fraudulent transfers pursuant to NYDCL §278.

139.   The *Bank* Fr and *Markus* FR are entitled to an Order and Judgment: (a) avoiding and recovering the transfers as fraudulent pursuant to NYDCL Section 278; (b) setting aside the transfers as fraudulent transfers; and (c) recovering the transfers, or the value thereof, from Bykov and BG Atlantic, plus interest and costs, attorneys' fees and costs under NYDCL §276-a, and/or such other amount as may be determined by the Court.

## COUNT III
### BREACH OF FIDUCIARY DUTIES AND AIDING AND ABETTING
### BREACH OF FIDUCIARY DUTY UNDER NEW YORK LAW
### *MARKUS* FR V. BYKOV AND BG ATLANTIC

140.   Plaintiff repeats and re-alleges the allegations set forth above as if fully set forth herein.

141.   There exists a fiduciary relationship between Bykov and Markus.   The relationship arose in June 2016 and December 2018 when Markus gave Bykov POAs. Pursuant to these two POAs, Bykov was to represent Markus in courts and before other

authorities, participate in bankruptcy proceedings, and negotiate loan issues with banks. Bykov acted on Markus' behalf as her, *inter alia*, advisor, manager and director of the LM Entities, co-Trustee in the LM Trusts and Protector of LARMAR.  Bykov is also the accountant and financial administrator for Markus and he controls BG Atlantic.

142.    The nature of the fiduciary relationship was that Bykov was in a position of a high degree of trust and confidence and was required to act with loyalty, due care and candor towards Markus, as well as to protect and maximize her assets.

143.    BG Atlantic acted under the direction and control of Bykov.  The knowledge, conduct, liability and fiduciary and other obligations of Bykov are properly imputed to BG Atlantic.

144.    The circumstances surrounding the breach of the fiduciary relationship between Bykov and Markus are as follows: (a) Bykov and BG Atlantic engaged in fraudulent conduct, including multiple recoveries from the sale of Markus' assets outside the U.S. under a collusive judgement obtained in New York; (b) they transferred the proceeds from such recoveries to the bank accounts of BG Atlantic; and (c) they transferred BG Atlantic-related funds to bank accounts controlled by Bykov.

145.    As a direct and proximate result of Bykov's breaches of fiduciary duty, in concert with BG Atlantic, certain European properties owned by Markus were used in Bykov's collusive conduct and proceeds from the sale of those properties have been dissipated.

146.    Bykov's breaches of fiduciary duty, in concert with BG Atlantic, proximately caused the *Markus* FR to lose a substantial amount of money to distribute to Markus' creditors.

147.    If Bykov, in concert with BG Atlantic, had not breached his fiduciary duties, and had instead disclosed the facts concerning Markus' European properties or their conflicts of interest, or had taken steps to protect the European properties and/or proceeds from their sale, the assets would not have been dissipated or diminished.

148.     Bykov has forfeited rights to all fees and compensation he collected for the services he provided to Markus because he breached his fiduciary duties.  Accordingly, Bykov equitably should be required to disgorge all fees and compensation he has collected from the LM Entities and Markus.

149.     Bykov and BG Atlantic are liable to the *Markus* FR for the breaches of fiduciary duties in an amount to be determined at trial, plus equitable disgorgement of benefits and fees, and interest, costs, attorneys' fees and exemplary damages.

## COUNT IV
### UNJUST ENRICHMENT
### *BANK* FR AND *MARKUS* FR V. LARMAR AND ICG

150.     Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

151.     Because of the fraudulent conveyances described herein, LARMAR and ICG were unjustly enriched.

152.     The enrichment of LARMAR and ICG was at the expense of Markus, her bankruptcy estate, and the creditors of her bankruptcy estate.

153.     The circumstances relating to the fraudulent conveyances are such that equity and good conscience require LARMAR and ICG to compensate Markus' bankruptcy estate.

154.     Plaintiffs seek restitution of the property and/or the monies of which they were unfairly and improperly deprived, as described herein.

155.     By reason of the foregoing, the *Bank* FR and the *Markus* FR are entitled to an Order and Judgment issued against LARMAR and ICG in an amount of the fraudulent conveyances, plus interest thereon, attorneys' fees and costs, or such other amount as may be determined by the Court.

## COUNT V
### ACCOUNTING AND TURNOVER
### *BANK* FR AND *MARKUS* FR V. BYKOV, LARMAR, BG ATLANTIC, LM ENTITIES

156.     Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

157.     Defendants Bykov, LARMAR, BG Atlantic, and the LM Entities have collected monies.

158.     The *Bank* FR and the *Markus* FR have an interest in these monies.

159.     Bykov, LARMAR, BG Atlantic, and the LM Entities are in exclusive possession of the books, record and accounts that will disclose the liabilities, profits or benefits of these monies.

160.     The amounts of the liabilities, profits and benefits are unknown to the *Bank* FR and the *Markus* FR, and cannot be known without an accounting.

161.     The profits and benefits are property subject to the administration of the *Markus* FR under Bankruptcy Code § 541(a).

162.     By reason of the foregoing, the *Bank* FR and the *Markus* FR are entitled to an Order directing Bykov, LARMAR, BG Atlantic, the LM Entities, FIC and ICG to account for their liabilities, profits and benefits and to turn over to the *Markus* FR their profits and benefits pursuant to Bankruptcy Code §542.

## COUNT VI
### APPOINTMENT OF A RECEIVER
### *BANK* FR AND *MARKUS* FR V. LARMAR, BG ATLANTIC, AND LM ENTITIES

163.     Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

164.     Bykov's mismanagement of LARMAR, BG Atlantic, and the LM Entities necessitates the appointment of a receiver.

165.     Bykov has engaged in persistent self-dealing using BG Atlantic and the LM Entities resulting in property being removed from the estate.

166.     The history of misconduct and mismanagement by Bykov presents an emergent

situation in which a receiver is needed to protect the Plaintiffs' interests and prevent irreparable loss from the continuing removal of property from Markus' ownership.

167.    A remedy at law is insufficient to adequately protect the Plaintiffs' interests.

168.    There is a strong likelihood that Plaintiffs will prevail on their claims as set forth herein.

169.    The Court has the authority pursuant to NY CPLR §6401 to appoint a receiver of all property, business, and affairs of LARMAR, BG Atlantic, and the LM Entities.

170.    The Court also has the inherent authority as a court of equity to appoint a receiver of all property, business, and affairs of LARMAR, BG Atlantic, the LM Entities.

171.    By reason of the foregoing, the *Bank* FR and the *Markus* FR are entitled to an Order appointing a receiver to take possession of LARMAR, BG Atlantic, and the LM Entities, in order to: (a) preserve the status quo; (b) ascertain the true financial condition of Markus' assets; (c) prevent misappropriation or misuse of Markus' assets; (d) preserve the books, records, and documents concerning Markus' assets; and (e) prevent the encumbrance or disposal of Markus' assets.

## COUNT VII

**FRAUDULENT CONVEYANCE
(UNDER RUSSIAN LAW –
RUSSIAN CIVIL CODE ("RCC"), ARTICLES 1, 10 AND 168)
*MARKUS* FR V. LARMAR AND ICG**

172.    Plaintiff repeats and re-alleges the allegations set forth above as if fully set forth herein.

173.    Beginning not later than February 2011, and continuing to an unknown date, Markus transferred 95% of her interest in the LM LLCs to LARMAR and 5% to ICG.  The LM LLCs were worth in excess of $15 million.

174.    Each of the above transfers constituted a conveyance of property with actual intent to defraud creditors and dissipate assets.  This is in violation of the obligation to act in

good faith (Russian Civil Code, Article 1, Section 3) and of prohibition of abuse of right (Russian Civil Code, Article 10, Section 1).

175.   Acting in bad faith violates the prohibition established in Russian Civil Code, Article 10, and hence the above transfers shall be declared void under Articles 10 and 168 of the Russian Civil Code.

176.   Therefore, the *Markus* FR is entitled to avoid the fraudulent transfers pursuant to Articles 10 and 168 of the Russian Civil Code.

177.   For the foregoing reasons, the *Markus* FR is entitled to an Order and Judgment: (a) avoiding and recovering the transfers as fraudulent pursuant to Articles 10 and 168 of the Russian Civil Code; (b) setting aside the transfers as fraudulent transfers; and (c) recovering the transfers, or the value thereof, from LARMAR and ICG, plus such other amount as may be determined by the Court.

## COUNT VIII
### FRAUDULENT CONVEYANCE
### (UNDER RUSSIAN LAW – RCC, ARTICLES 1, 10 AND 168)
### *BANK* FR V. LARMAR, ICG AND MARKUS

178.   Plaintiff repeats and re-alleges the allegations set forth above as if fully set forth herein.

179.   Beginning not later than February 2011, and continuing to an unknown date, Markus transferred 95% of her interest in the LM LLCs to LARMAR and 5% to ICG.  The LM LLCs were worth in excess of $15 million.

180.   Each of the above transfers constituted a conveyance of property with actual intent to defraud creditors and dissipate assets.  This is in violation of the obligation to act in good faith (Russian Civil Code, Article 1, Section 3) and of prohibition of abuse of right (Russian Civil Code, Article 10, Section 1).

181.   Acting in bad faith violates the prohibition established in Russian Civil Code, Article 10, and hence the above transfers shall be declared void under Articles 10 and 168 of

the Russian Civil Code.

182.     Therefore, the *Bank* FR is entitled to avoid the fraudulent transfers pursuant to Articles 10 and 168 of the Russian Civil Code.

183.     For the foregoing reasons, the *Bank* FR is entitled to an Order and Judgment: (a) avoiding and recovering the transfers as fraudulent pursuant to Articles 10 and 168 of the Russian Civil Code; (b) setting aside the transfers as fraudulent transfers; and (c) recovering the transfers, or the value thereof, from LARMAR, ICG and Markus, plus such other amount as may be determined by the Court.

## COUNT IX
### COMPENSATION OF HARM
### (UNDER RUSSIAN LAW – RCC ARTICLES 10, 1064)
### *BANK* FR AND *MARKUS* FR V. BYKOV AND BG ATLANTIC

184.     Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

185.     Beginning in October 2016 with the formation of BG Atlantic, Bykov orchestrated a collusive "judgment" against Markus in the New York Supreme Court (obtained in January 2017), which he then used to bring actions in various jurisdictions abroad (Latvia, France, UK) to recover or to attempt to recover monies to "satisfy" the fake judgment.  These actions by Bykov caused harm to the Bank's creditors and Markus' creditors.

186.     Under the Russian Civil Code, Article 1064 liability for causing harm arises where:

      a.   Harm is suffered by a plaintiff (the concept of harm is wide, and includes (inter alia) personal injury, property damage, loss of property or property rights, lost profits, interference with contractual rights and moral damage);

      b.   Harm is caused by an act of the defendant;

    c.   The defendant's act is unlawful; and

    d.   The defendant is at fault (fault arises where the defendant has acted intentionally or negligently; the burden is on the person who has caused harm to prove the absence of fault).

187.    Bykov acted in violation of the provisions of the Russian Civil Code, Article 1, Section 3 (requirement to act in good faith) and Article 10, Section 1 (prohibition of abuse of right) and knowingly caused harm to the Bank's creditors and Markus' creditors. Therefore, Bykov shall be liable under Russian law for damages caused to the Bank and Markus.

188.    For the foregoing reasons, the *Bank* FR and the *Markus* FR are entitled to an Order and Judgment issued against Bykov and BG Atlantic for compensation of harm and damages plus such other amount as may be determined by the Court pursuant to Articles 10 and 1064 of the Russian Civil Code.

## COUNT X

### UNJUST ENRICHMENT
### (UNDER RUSSIAN LAW – RCC ARTICLES 1102, 1103, 1104  AND 1105)
### *BANK* FR AND *MARKUS* FR V LARMAR AND ICG

189.    Plaintiffs repeat and re-allege the allegations set forth above as if fully set forth herein.

190.    Because of the fraudulent conveyances described herein, LARMAR and ICG were unjustly enriched.

191.    The enrichment of LARMAR and ICG was at the expense of Markus, her bankruptcy estate and the creditors of her bankruptcy estate.

192.    Plaintiffs seek restitution of the property and/or the monies constituting the unjust enrichment and of which they were unfairly and improperly deprived, as described herein.

193.    By reason of the foregoing, the *Bank* FR and the *Markus* FR are entitled to an Order and Judgment issued against LARMAR and ICG in an amount of the fraudulent

conveyances, plus interest thereon, attorneys' fees and costs, or such other amount as may be determined by the Court pursuant to Articles 1102, 1103, 1104 and 1105 of the Russian Civil Code.

## VII.  PRAYER FOR RELIEF

WHEREFORE, the *Bank* FR and *Markus* FR seek relief as follows:

A.  Money damages;

B.  Adjudging the transfers of the LM LLCs to LARMAR and ICG, and ICG and FIC to LARMAR as fraudulent, avoided and set aside;

C.  Accounting and turnover;

D.  Receiverships over LARMAR and LM Entities;

E.  Costs and attorneys' fees;

F.  Awarding Plaintiffs pre- and post-judgment interest at the applicable legal rate; and

G.  Awarding Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: November 19, 2019                    Respectfully submitted,

         */s/ Bruce Marks*
Bruce Marks, Esquire
MARKS & SOKOLOV, LLC
1835 Market Street, 17th Floor
Philadelphia, PA 19103
(215) 569-8901

*Attorneys for Yuri Vladimirovich Rozhkov
in his Capacity as Trustee and Foreign
Representative for the Debtor, Larisa Markus
and
Attorneys for State Corporation "Deposit
Insurance Agency"
in its Capacity as Trustee and Foreign
Representative for the Debtor, Foreign
Economic Industrial Bank Limited
"Vneshprombank" Ltd.*

## APPENDIX A

## FOREIGN LAW

## PROVISIONS OF THE RUSSIAN CIVIL CODE

### Article 1. The basic principles of civil legislation [Section 3]

3. In establishing, exercising and protection of civil rights and in performing civil obligations parties to civil relations shall act in good faith. No one shall benefit from one's unlawful or bad faith actions.

…

### Article 10. Limits on the exercise of civil rights

1. The exercise of civil rights exclusively with the intention to cause harm to another person, actions in circumvention of a statutory provision with an unlawful purpose, as well as any other intentional mala fide exercise of civil rights (abuse of a right) is prohibited.

The use of civil rights for the purpose of limiting competition, as well as the abuse of dominant market position, is prohibited.

2. If the requirements set forth in para. 1 of this article are not complied with, a court, commercial court or arbitral tribunal, considering the nature and effect of the abuse committed, refuses to enforce a right claimed in full or in part and takes other actions prescribed by statute.

3. Where the abuse of a right takes the form of an action in circumvention of a statutory provision with an unlawful purpose, the consequences set forth in para. 2 of this article shall apply unless other consequences of such actions are provided in this Code.

4. If the abuse of a right caused a violation of another person's right, such person may claim damages for losses caused thereby.

5. The good faith of parties to civil relations and reasonableness of their actions are presumed.

### Article 168. Invalidity of a transaction violating a statute or other statutory instrument

1. Except for cases provided by para. 2 of this article or other statute, a transaction violating a statute or other statutory instrument is voidable, unless it follows from a statute that other consequences of the violation not leading to invalidity should apply.

36

2. A transaction which violates a statute or other statutory instrument and which threatens the public interest or rights and interests of other persons which are protected by the law is void, unless it follows from a statute that such a transaction is voidable or that other consequences of the violation not leading to invalidity should apply.

### Article 301. Reclaiming of property from another's unlawful possession

The owner shall be entitled to reclaim his property from another's adverse possession.

### Article 1064. General grounds for liability in tort

1. Harm caused to the person or property of a citizen, as well as harm caused to the property of a legal person, shall be compensated in full by the person who caused the harm.

A statute may place the duty to compensate for the harm on a person who is not the person that caused the harm.

A statute or contract may place a duty on the person who caused the harm to pay the victim additional compensation in excess of compensation for the harm. The statute may place a duty on the person who is not the person that caused the harm to pay the victim additional compensation in excess of compensation for the harm.

2. The person who has caused the harm is not liable to pay compensation for the harm if it proves that it was not at fault for causing the harm.   A statute may establish a duty to compensate for the harm even when the person who caused the harm was not at fault.

3. The harm caused by lawful actions shall be compensated in cases provided in a statute.

4. A claim for compensation may be rejected if the harm was caused at the request of a victim or with the victim's consent and the actions of the person who caused the harm do not militate against public morals.

### Article 1102. The Obligation to Return Unjust Enrichment

1. A person who has acquired or saved property (acquirer) without the grounds, established by the law, other legal acts or the  transaction, at the expense of another person (victim) shall be obliged to return to the latter the property acquired or saved unjustly (unjust enrichment), except for the cases, provided for by Article 1109 of this Code.

2. The rules, provided for by this Chapter, shall be applicable regardless of the fact whether unjust enrichment resulted from the behavior of the acquirer of property, the victim himself, third persons or took place regardless of their will.

### Article 1103. Interrelation between claims for return of unjust enrichment and other remedies for protection of civil rights

Unless otherwise provided in the Civil Code, other laws and other legal acts and does not follow from the essence of respective relations, the rules set forth in this chapter shall apply also to claims for:

1)  return of executed consideration under an invalid transaction;

2)  on reclaiming of property by the owner from another's adverse possession;

3)  by one party in an obligation against another party in the obligation for return of executed consideration under that obligation;

4)  on compensation of harm, including harm inflicted by mala fide actions of the enriched person.

### Article 1105. Compensation for the Value of Unjust Enrichment

1. If it is impossible to return the unjustly acquired or saved property in kind, the acquirer shall compensate to the victim for the actual value of this property at the time of its acquisition, and also for the losses, caused by the subsequent change in the value of property, if the acquirer has not reimbursed its value at once after he has known about unjust enrichment.

2. A person who unjustly used somebody else's property without intention to acquire it or used somebody else's services, shall compensate the victim the amount [the person] saved owing to such use at the price existing at the time when this use ended and in the place where the use took place.