THE LAW OFFICES OF DANIEL A. SINGER PLLC
630 THIRD AVENUE, 18TH FLOOR
NEW YORK, NEW YORK 10017
TEL: (917) 696-6047

April 2, 2020

By Electronic Filing
Judge Martin Glenn
New York Southern District of New York, Bankruptcy Court
One Bowling Green
New York, NY 10004-1408

        Re: Foreign Economic Industrial Bank Limited "Vneshprombank" Ltd. Case No. 16-13534 (the "Bank Case")/In Re Larisa Markus Case No. 19-10096 ("Markus Case")(collectively the "Chapter 15 Proceedings"); Adversary Proceeding Case No. 19-01413 ("Markus Adversary Proceeding")/Adversary Proceeding Case No. 19-01414 ("Bank Adversary Proceeding")(collectively, the "Adversary Proceedings")

Dear Judge Glenn:

    We are the attorneys for what have commonly been referred to as the LM Entities and the Protax Entities in the above-referenced matters. I am writing to provide a status report as per the Case Management and Scheduling Order #3 in the above-referenced matters.

Progress on Settlement

    As the Court is aware, the parties have been actively engaged in settling this matter. Initially, progress on settlement had gone slower than anyone would have liked. It is respectfully submitted to that this was largely due to the number of parties which are either directly or indirectly involved in the process (in Russia, the United States, and elsewhere), systemic and cultural differences with respect to how legal matters are addressed in the Unites States and Russia, and other related complexities which can be expected in addressing the resolution of a multinational proceeding.

    Regardless, in recent weeks there has been an upsurge in activity by all parties in an attempt to bring this matter to a resolution as quickly possible. On or about March 17th, I forwarded revisions of the most recent draft of the settlement agreement. There was subsequently multiple exchanges of correspondence between the principals, assisted by counsel, to resolve the outstanding points. On Monday (March 30, 2020), I engaged in a 90 minute conference call with

1

Ethan Heinz, Esq of Dentons' Moscow office (who, it is my understanding, is serving as settlement counsel for the Foreign Representative with respect to this matter) as well as with principals from both sides. Without going into the substance of such conference call, I will state that we addressed what appeared to be the five main outstanding points on settlement. It was a very productive call and it appeared that most of the outstanding issues were resolved at least in principal as a result of that call. It was agreed that Mr. Heinz would circulate a revised draft after conferring further with his clients. I advised Mr. Heinz that we had a conference scheduled with the Court on April 6th and asked whether it would be possible to get a revised draft prior to that time. He explained that he did not believe that that would be feasible but he stated that he would move expeditiously in forwarding me the proposed revisions. As of the drafting of this letter, I have not yet received such proposed revisions.

As alluded to above, neither Mr. Marks nor his firm are directly involved in the settlement of this matter. I do not believe that same is in dispute as Mr. Marks has advised me on multiple occasions on his lack of direct involvement in settling this matter. It is my understanding, however, that Mr. Marks continues to be indirectly involved in that Dentons is consulting with him and his firm with respect to the resolution of these actions.

I agree with Mr. Marks that this matter needs to be resolved as quickly as possible. Indeed, I do not believe that there is anyone involved in this process who feels any differently. I do not, however, believe that 30 days is a realistic timeframe for bringing settlement to a conclusion.  Rather, I believe that 6 weeks is a more realistic estimate. My proposal is that we suspend all activity in these actions for 6 weeks so that full focus can be placed on resolving this matter and that a control date be set by the Court for some time in late May or early June. As I set forth below and I as will address more during the conference, even setting aside the issue of settlement, there are severe restriction about what could actually get done in these matters given the current environment.

A proposal which I would like to make is to have a mediator assigned to this matter. I think a mediator would be extremely helpful in "breaking the ice" on any remaining outstanding issues and will help expedite the finalizing of a resolution. I have addressed this with my clients' representative and he is in accordance with same. Obviously, any mediation would have to take place virtually at this time. It is possible that after I receive the next draft from Mr. Heinz that the parties will find that a mediator is not necessary. However, so as not to cause any further delays, I think it would be help to have such a mechanism for limited mediation in place should the use of such services become necessary.

There Has Full and Timely Compliance With The Turnover Order

On October 23, 2019, this Court issued an order resolving the Foreign Representative "Emergency Motion to Enforce the Recognition Order and Entrust the Asset of the Larisa Revocable Trust to the Administrations of the Foreign Representative" (the "Turnover Order" *Markus dkt no. 173)*. The Turnover Order clearly provided the assets which were to be turned over pursuant to said order: i) the monies that had been transferred from the Larisa Markus Revocable Trust (the "Lm Trust") account at Chase (the "LM Trust Chase Account") to my firm's escrow account  (the "LM Trust Citibank Escrow Account") pursuant to the order of this

2

Court dated July 30, 2019 (*dkt no. 127)* and ii) the balance of certain proceeds from the sale of property (the "Subject UK Property") having an address of Flat 19, Albert Court Central Block Prince Consort Road, London, United Kingdom  (the "Subject UK Proceeds"). *See Markus dkt no. 173.*

On March 29, 2019, the Subject UK Proceeds in the amount of $5,397,302.19 were transferred to the LM Trust Chase Account. (*Markus dkt no. 126)*. At the time the freezing order was issued by the Honorable Mary Kay Vyskocil on May 29, 2019 (the "May 29, 2019 Freeze Order"), there remained $1,011,153.48 in the LM Trust Chase Account, although not all of the monies in said account consisted of the Subject UK Proceeds[1]. *Id.* Prior to the issuance of the May 29, 2019 Order, $3,000.000 of the Subject UK Proceeds had been transferred to the 550 Park Avenue LLC Account and the balance of the Subject UK Proceeds had been disbursed as payments made in the ordinary course of business to the other LM Entities; Protax Entities; and third parties including, without limitation, attorneys. *Id.*

On or about November 5, 2019, in advance of the 14 day deadline set forth in the Turnover Order, all proceeds in the LM Trust Citibank Escrow Account ($1,010,878.48[2]) and $3,000,000.00 in the 550 Park Avenue LLC Account- the amount which constituted the balance of the Subject UK Proceeds in said account- was transferred to Marks & Sokolov's escrow account. Such transfer, totaling $4,010,878.48, constituted the entire amount which was to be turned over pursuant to the Turnover Oder. Indeed, the only "dispute" which Mr. Marks raised with respect to said turnover was that it did not include the $78,084.93 balance in the 550 Park Avenue LLC Account. This was memorialized in correspondence between counsel (Exhibit A hereto) as well as in correspondence with the Court (*Markus dkt no. 206)*. The reason that the $78,084.93 was never transferred is simple: the Turnover Order did not call for such a transfer as such sum was not part of the Subject UK Proceeds. Mr. Marks has reiterated this "dispute" in "status reports" which had been filed with the Court on approximately a weekly basis.

The "Demands" Made By The Foreign Representative On March 26, 2020 Purportedly Pursuant To The Turnover Order

Until last week, no demands were ever made by the Foreign Representative for the transfer of any further funds pursuant to the Turnover Order. Last Thursday (March 26, 2020), I received two letters from Mr. Marks demanding the "turnover" of certain monies as well as certain documents which he purported that the Foreign Representative was entitled to pursuant to Turnover Order. The first such letter was directed to me personally and demanded the "turnover" of $55,900 of legal fees which had been paid to me prior to the May 29, 2019 Freeze Order (the "Singer Demand Letter", Exhibit B). Specifically, Mr. Marks purports to make an issue of two payments which were made to me, one in the amount of $41,033.00 paid on or about April 5, 2019 (the April 5th Payment") and the other in the amount of $14,867.00 paid on or about May 20, 2019 (the "May 20th Payment").  The second was directed to me as counsel for the Protax Entities and Ilya Bykov ("Bykov"), demanding the "turnover" of $1,917,731.48 by Bykov and

---

[1] There was approximately $100,914.41 in the LM Trust Chase Account immediately prior to the transfer of the Subject UK Proceeds to such account (*Markus dkt no. 126)*

[2] A $275.00 bank charge had been charged by Chase in or about June 2019, thereby reducing the balance in such account from $1,011,153.48 to $1,010,878.48

3

the Protax Entities (the "Protax Demand Letter", Exhibit C). As set forth below, there is no basis for demanding the "turnover" these funds pursuant to the Turnover or otherwise. It is my understanding that Mr. Marks sent similar letters to other attorneys who had previously participated in this action demanding the "turnover" of monies and documents and such letters may have also been sent to other third parties.

It is respectfully submitted that this onslaught of demands is nothing more than a charade by the Foreign Representative in an attempt to utilize the Court to exert actual or prospective leverage in the settlement process. It is clearly being done in bad faith. Moreover, even setting aside the absence of a legal basis for these demands, the timing of this tactic- in the middle of a pandemic which is having an unprecedented impact on the social and economic lives of peoples nationally and particularly in New York- is beyond disturbing and, quite frankly, truly tasteless.

With respect to the demands for the "turnover" of the legal fees paid to my office, the matter was already addressed in detail in correspondence with the Court dated June 10, 2019 (the "June 10th Letter" *Markus dkt no. 63)* which was sent in direct response to correspondence which Mr. Marks had issued to the Court dated May 31, 2019 (*Markus dkt no. 60)*. As I set forth in said correspondence, both the April 5th Payment and May 5th Payment constituted payment of legal fees and were made in the ordinary course of the business made prior to the May 29, 2019 Freeze Order being in effect. The April 5th Payment included payment of fees and disbursements which had been incurred in the Chapter 15 Proceedings as well as a replenishment of the retainer in the amount of $30,000.00 which had been exhausted at the time that the May 29, 2019 Freeze Order came into effect. As I set forth in the June 10th Letter, the May 20th Payment consisted of payment of $4,867.00 of fees and disbursements which had been incurred in a foreclosure action involving LM Realty 31B LLC, the replenishment of the retainer in said action in the amount $5,000.00 and the payment of a $5,000.00 retainer in a related foreclosure action involving LM Property Management LLC. At the time that the May 20, 2019 Freeze Order went into effect, some of the monies on retainer in the two aforementioned foreclosure actions had not yet been incurred. As I made clear in my June 10th Letter, however as the May 20th Payment was rendered in the ordinary course of business prior to the May 29, 2019 Freeze Order going into effect, it was my position that the May 20, 2019 Freeze Order had no impact on the May 20th Payment and, as such, there was absolutely no basis for Mr. Marks' request that I "freeze" the portion of the May 20th Payment which had not been used at the time the freeze order went into effect[3]. Regardless, the retainer portion of the May 20th Payment has been incurred in its totality. As such, even setting aside the baseless reasoning for the demand, there is simply nothing to "turn over" to Mr. Marks[4].

---

[3] As I set forth in the June 10th Letter, "[n]otwithstanding the foregoing, in the instance in that the Court issues a subsequent order with respect to any portion of the May 20th Payment which had not been incurred as of the effectuation of the [May 29, 2019 Freeze Order], I will of course make such funds available and abide by said order, subject to any right to appeal" No subsequent order requiring same was ever issued by this Court.

[4] Moreover, even setting aside the absence of a legal basis for same, it is respectfully submitted that it is completely inappropriate to demand the return of fees paid to counsel. It is respectfully submitted that this is particularly the case in the present matters where I have quite literally served as an officer of the court, effectively serving as conduit for a one way discovery process with the Foreign Representative so that it could purport to build its case and receive information about assets. That the Foreign Representative is now seeking the "turnover" of legal fees which were effectively used to assist it in this process is simply nonsensical.

4

Similarly, the monies sought in the Protax Demand Letter all constituted payments which were made in the ordinary course of business prior to the May 20th, 2019 Freeze Order going into effect. Moreover, the amount being sought is simply nonsensical as it exceeds the balance of the Subject UK Proceeds! In short, there is simply no basis for "turnover" demanded in the Protax Demand Letter.

Clearly, if Mr. Marks truly believed that the Turnover Order entitled the Foreign Representative to the amounts being sought in the Singer Demand Letter, the Protax Demand Letter, as well as the amounts which are apparently being sought from other third parties- amounts which appear to total in excess of 2 million dollars- he would not have waited almost 6 months from the issuance of the Turnover Order to seek such funds. Indeed, Mr. Marks' delay in demanding such funds and the time of such demands (approximately 10 days prior to a scheduled conference) merely serves to highlight the lack of merit of same.

Moreover, while I will not address the merit of any settlement discussions, I will state that the monies being sought in the Singer Demand Letter and the Protax Demand Letter are not contemplated in any manner in settlement. As such, they are clearly being made in bad faith. In the unlikely event that the Court allows Mr. Marks to pursue an application for the amounts demanded, it will undoubtedly permanently derail settlement of this matter.

In short, it is the position of the LM Entities and Protax Entities that the Foreign Representative should not be permitted to pursue this baseless application for the turnover of additional monies. In the unlike event that this court does allow such an application to proceed, it is respectfully submitted that it must be done as a formal motion and the LM Entities and Protax Entities will vehemently oppose said motion. Critically, however, it is respectfully submitted that is simply not possible to effectively oppose such an application in the current environment. I am working remotely and do not have complete access to the documents and other information which would be necessary to oppose such a motion Both Protax and Bykov are also operating remotely and face similar restrictions with respect to the information and documents which are needed to oppose this motion. Given the magnitude of the relief being sought, it is respectfully submitted that both my clients and I would be severely prejudiced if we were required to oppose such a motion in the current environment. As such, in the unlikely event that this Court allows the Foreign Representative's application to go forward, it is respectfully submitted that it needs to be delayed until work life returns to a more normal state.

Similarly, Mr. Marks makes demands for certain documents, both privileged and unprivileged, in both the Singer Demand Letter and Protax Demand Letter and purports to further elaborate on same in the various drafts of his "status report" which were forwarded to me on Tuesday and Wednesday this week[5]. Given the limitations of the current environment, I cannot go through a detailed "check" of the non-privileged documents being demanded, particularly in the short period which I have had to review Mr. Marks' "status report". Notwithstanding the foregoing and without any prejudice to my clients' respective rights, all of

---

[5] I declined to meet and confer with Mr. Marks regarding his proposed status report as, among other things, I believed it was beyond obvious that I would not agree with the "turnover" he was seeking. Regardless, I left open the possibility of having a meet and confer on Friday should Mr. Marks so desire after he has reviewed my status report. A copy of such correspondence is attached hereto as exhibit D.

the non-privileged documents being "demanded" were almost certainly produced in previous discovery productions. With respect to the privileged documents being sought, we would vehemently oppose such production. As such, in the unlikely event that this Court allows such an application to go forward, it is respectfully submitted that we would need ample opportunity to oppose such a motion. Again, given the current environment, we would be restricted in our ability to oppose same. By mere example, the privileged documents which the Foreign Representative is purportedly seeking are all in my office in hard copy having been flagged accordingly. As such, in the unlikely that this Court allows such an application to go forward, it is respectfully submitted that it needs to be postponed until we can return to a more normal work environment so that we can properly oppose same.

Mr. Marks also appears to be demanding in his "status report" that the Foreign Representative should take control of certain entities. Again, we would oppose any such application and, again, it is respectfully submitted any such application would need to be postponed until it can be adequately opposed. It goes without saying that this sudden attempt to grab control of certain entities and seek documentation, particularly privileged documentation, is antithetical to settlement.

Continued Suspension of Discovery Deadlines

One issue on which Mr. Marks and I appear to be in agreement is that the discovery deadlines should continue to be suspended while settlement is pending. Not only is the conducting of such discovery antithetical to settlement but it is simply unfeasible in the current environment as I had set forth in previous correspondence (*Markus dkt no 248*). Mr. Marks appears to recognize the restrictions which the current environment places on the ability to conduct discovery[6].

I thank the Court for its attention to this matter.

                    Respectfully submitted,
                    /s
                    Daniel A. Singer

---

[6] On the issue of the letters which were sent to "Markus agents" Mr. Marks purports that he believes that some of the agents were not contacted. This is simply not the case. While I would need to confirm my records, I believe that there was only 1 "agent" which could not be contacted as their address had changed and we were unable to locate any new address. The letter and accompanying attachments had, however, been sent forwarded to that agent's last known address. We also dispute that we would need to identify which specific agents produced which documents. The purpose of reaching out to the agents was to be obtain documents which were allegedly in the possession, custody, and/or control of the Protax Entities, LM Entities, and Markus. As such, the documents produced by such "agents" was merely an extension of the documents which had been produced by the discovery parties in this action. The purpose of contacting such agents, however, was not to act as a conduit for the Foreign Representative so that my office could in effect subpoena such "agents" on behalf of the Foreign Representative. It is respectfully submitted that this is an important distinction. Regardless, in the unlikely event that this Court determines that the specific documents produced by each respective agent needs to be identified, I would not be able to do same until work life returns to normal as the hard copies form of such documents organized accordingly are in my office.